AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
4/7/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___JB___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
04/07/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___KL___ DEPUTY

United States of America

v.

JOSE LUIS ARIAZ,

Defendant.

Case No.   2:21-mj-01667 -DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 6, 2021, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. § 841 | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/ Michael Flanigan
Complainant's signature

Michael Flanigan, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  April 7, 2021

*Alicia G. Rosenberg*
Judge's signature

City and state:  Los Angeles, California

Hon. Alicia G. Rosenberg, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Michael Flanigan, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Jose Luis ARIAZ ("ARIAZ") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES") in the custody of the Drug Enforcement Administration, in Los Angeles, California, as described more fully in Attachment A:

   a. A pink Samsung S10e ("SUBJECT DEVICE 1"); and

   b. A white Samsung S20 5G SM-G981U Cellular telephone with IMEI 354268/11/107058/2 printed on a sticker on the rear of the telephone ("SUBJECT DEVICE 2").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.   I am a Special Agent ("SA") employed by the United States Drug Enforcement Administration ("DEA") assigned to Los Angeles Field Division Enforcement Group 4.  I have been employed with the DEA since August 2008.  I have received specialized training in narcotics trafficking and money laundering from the DEA.  I have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, methods used to finance drug transactions, methods of distribution, and movement of drug proceeds.  I have had numerous conversations regarding these subjects with other law enforcement officers.

6.   I am familiar with the methods of operation utilized by drug traffickers and drug trafficking organizations, including the distribution, storage, and transportation of narcotics, and the collection of monetary narcotics proceeds.  I am also familiar with methods employed by large drug organizations to thwart detection by law enforcement, including the use of debit calling cards, public telephones, cellular telephone technology, mobile applications, electronic

messenger/messaging systems, voice over internet phone technology, pagers, counter surveillance, encrypted devices, false, fictitious, or stolen identities, and coded communications.  In conducting investigations with DEA, I have debriefed defendants, informants, and witnesses who had personal knowledge regarding narcotics trafficking organizations and the methods in which these organizations operate.  I have also participated in various aspects of these investigations, including making and directing controlled purchases of dangerous drugs, conducting physical and electronic surveillance, using informants and cooperating sources, executing search warrants, executing arrest warrants, participating in consensual searches, installing and utilizing GPS devices, and installing and utilizing electronic recording devices.  I have used a variety of investigative techniques and resources, including surveillance, confidential sources, search warrants, telephone toll analysis, and wire/electronic intercept communications analysis.  Prior to my employment with the DEA, I was a Captain in the United States Army, where I served eight years on active duty.

### III. SUMMARY OF PROBABLE CAUSE

7.   On April 6, 2021, after multiple recorded calls arranging for a drug purchase, a DEA Confidential Source ("CS") met with Jose Luis ARIAZ at a restaurant parking lot in Vernon, California, to purchase approximately 50 pounds of methamphetamine.  ARIAZ drove to the arranged parking lot location in a white Toyota Camry, with an unknown female sitting

in the passenger seat.  Law enforcement observed ARIAZ back the Camry into a parking spot near the CS.  The CS walked up to ARIAZ, and ARIAZ opened the trunk of the Camry from inside the car and instructed the CS to look inside.  The CS then walked to the trunk while ARIAZ and the passenger remained in the car.  Law enforcement saw the CS inspect the trunk before alerting law enforcement to the presence of drugs.  Upon this alert, law enforcement took both ARIAZ and the passenger into custody.

8.   Law enforcement searched the trunk and found two boxes, one containing two heat-sealed food saver bags containing an opaque crystalline substance resembling methamphetamine, and the other containing three heat-sealed food saver bags containing an opaque crystalline substance resembling methamphetamine.  Agents tested the suspected methamphetamine using the TruNarc spectrometer.  The test confirmed that the bags contain methamphetamine.  At the time of ARIAZ's arrest, two Samsung cellular telephones (the SUBJECT DEVICES) were found and seized from the center console of the Camry.

### IV. STATEMENT OF PROBABLE CAUSE

9.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

10.  On March 30, 2021, I received information from a DEA CS[1] regarding a conversation between the CS and a drug broker in

---

[1] The CS has been working with DEA since 2006 and has worked with Enforcement Group 4 of the Los Angeles Field Division since 2018.  The CS provides information and services supporting DEA

Mexico. The CS explained that during recent conversations with the broker, they had discussed a multi-pound methamphetamine deal, where the CS would purchase methamphetamine from an associate of the broker in Los Angeles, California.

11. The CS communicated with the broker via WhatsApp in the Spanish language and provided me with his communications with the broker. DEA SA David Doherty, who is fluent in Spanish, reviewed the messages and informed me that the conversation between the CS and the broker utilized coded language to facilitate the drug transaction.

12. On April 5, 2021, the CS provided his/her number to the broker and asked him to pass the number to his contact in Los Angeles. The broker replied by indicating that he would pass the CS's number to his Los Angeles associate, and the CS should expect a call where the Los Angeles associate would say they were "calling on behalf of Junior."

13. Later that same day, the CS informed me that an individual using phone number (209) 696-5181 (later confirmed to be SUBJECT DEVICE 1) contacted him/her via the number the CS had provided to the broker earlier that day. This call was recorded in the Spanish language and was reviewed by SA Doherty. During the call, the caller greeted the CS and stated he was "calling on behalf of Junior." The caller and the CS then arranged to meet the following day around 1 p.m. to proceed with the

---

investigations throughout the United States and has testified in multiple federal trials. The CS assists DEA for financial benefit and has not yet been paid for his/her support in this investigation. The CS has several arrests and a 2008 misdemeanor conviction for grand theft.

transaction. The CS told the caller that the CS would call again around 11 a.m. the following day to confirm that the deal was on.

14. The following day, on April 6, 2021, DEA Enforcement Group 4 agents, with assistance from Fullerton Police Department narcotics detectives, met with the CS at a neutral location. During this meeting, I directed the CS to place a recorded call to the (209) 696-5181 phone number, to confirm the time and general location of the meeting where they would finalize negotiations for the methamphetamine purchase.

15. During the recorded call, the CS told the caller that they would meet somewhere between Huntington Park and Los Angeles later that day. The CS told the caller that he/she would call him back when he found a good meeting location. The CS used code to confirm an expected payment to the caller -- "67 invintaciones a la quincera" -- translating to 67 invitations for the party, which I understand, based on my training and experience, to mean $67,000 for the requested 50 pounds of methamphetamine.

16. This number translates to $1,340 per pound of methamphetamine, which I know from my experience in conducting controlled purchases is a typical price for a pound of methamphetamine in Los Angeles, California.

17. After the call, I searched the CS for weapons and contraband and DEA SA LaShay Thomas outfitted the CS with an audio/video recording device. Agents and detectives then established surveillance in the vicinity of a Greenwich Village

6

Café parking lot located at 3809 Soto Street, Vernon, California, in preparation for the meeting.

18. DEA SA Vittoria Incandela and I remained with the CS at the neutral location before escorting the CS to the Greenwich Café parking lot. Once the CS arrived at the parking lot, at approximately 1:21 PM, I directed the CS to provide the location (Greenwich Village Café) to the caller in a recorded text message to the (209) 696-5181 phone number.

19. At approximately 2:06 p.m., I observed a white Toyota Camry driving through the restaurant parking lot. I saw a Hispanic male in the driver's seat, later identified as ARIAZ, and a Hispanic female in the front passenger seat. I watched as ARIAZ backed the Camry into a parking spot near where the CS was standing. The CS walked up to ARIAZ, and from inside the car, ARIAZ opened the trunk of the Camry and instructed the CS to look inside. I then saw the CS walk to the trunk and look inside. A short time later I saw the CS signal to law enforcement that there were drugs present in the trunk of the vehicle.

20. Law enforcement then approached the Camry, ordered both ARIAZ and the passenger from the vehicle, and detained them without incident. Once law enforcement determined there were no other occupants, they searched the car. In the trunk, law enforcement found two boxes, one containing three bags and the other containing two bags filled with an opaque, crystalline substance resembling methamphetamine.

7

21. In the front cabin area of the Camry, law enforcement found two Samsung cellular telephones (the SUBJECT DEVICES), which agents seized as evidence. I then called the (209) 696-5181 phone number, and SUBJECT DEVICE 1 rang.

22. As agents searched the Camry, law enforcement witnessed ARIAZ look at the passenger and tell her "I'm sorry."

23. SA Anthony Bliss tested the suspected methamphetamine using a TruNarc spectrometer. The test confirmed that the substance contained methamphetamine, with a gross weight of approximately 53 pounds, including packaging. The methamphetamine was then packaged for shipment to the DEA Southwest Laboratory for further analysis.

24. SA Incandela and SA Duran advised ARIAZ of his Miranda rights and interviewed him. ARIAZ informed agents that his car was at the mechanic for repairs, which is why he had asked the passenger to use her car. ARIAZ was presented with both cellular telephones, and he identified SUBJECT DEVICE 1 as his. ARIAZ then invoked his right to have an attorney present and the interview stopped.

25. SA Incandela and SA Duran advised the passenger of her Miranda rights. The passenger identified SUBJECT DEVICE 2 as hers. The passenger then invoked and the interview stopped. The passenger was released later that same day and remains under investigation.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

26. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

    c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or

9

others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

      e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

27.    As used herein, the term "digital device" includes the SUBJECT DEVICES.

28.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary

directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

    d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

29. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    c. Communications on the SUBJECT DEVICES are likely to be in Spanish and will require translation.

30. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or

12

eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

        b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

        c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ARIAZ's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of ARIAZ's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

31. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

32. For the reasons described above, there is probable cause to believe that ARIAZ has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

/s/
Michael Flanigan, Special Agent
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 7th day of April, 2021.

*Alicia G. Rosenberg*

THE HONORABLE ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE

14